# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of  )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No. **24MJ1409**
 )
Black Realme Cellular Phone )
Case Number: SYS-24-03-0225 )
("Target Device 2") )

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8 U.S.C., §§ 1324(a)(2)(B)(ii) and 1325, and 18 U.S.C. § 371 | Bringing In Aliens for Financial Gain; Illegal Entry; and Conspiracy to Bring In Certain Aliens |

The application is based on these facts:

See Attached Affidavit of CBP Officer Julio Corrales, U.S. Customs and Border Protection, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ J Corrales*
Applicant's signature

Julio Corrales, U.S. Customs and Border Protection
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____telephone_____ *(specify reliable electronic means)*.

Date: 04/10/2024

*/s/ D. Thomas Ferraro*
Judge's signature

City and state: San Diego, California    Hon. D. Thomas Ferraro, U.S. Magistrate Judge
Printed name and title

# ATTACHMENT A-2

PROPERTY TO BE SEARCHED

The following property is to be searched:

> Black Realme Cellular Phone
> Case Number: SYS-24-03-0225
>
> ("**Target Device 2**")

**Target Device 2** is currently in the custody of the Department of Homeland Security, Customs and Border Protection, 720 E. San Ysidro Blvd., San Ysidro, CA.

## **ATTACHMENT B**

ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachment A-1, and A-2, includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the **Target Device 1** only is a period of **January 11, 2024,** to and including **March 11, 2024,** and for **Target Device 2** is a period of **February 11, 2024**, to and including **March 11, 2024**:

a. tending to indicate efforts by undocumented aliens to illegally enter or remain in the United States and their efforts to be smuggled from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in undocumented aliens illegally entering or remaining in the United States, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in undocumented aliens illegally entering or remaining in the United States, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

  f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code Sections 1324(a)(2)(B)(ii) and 1325, and Title 18, United States Code, Section 371.

# AFFIDAVIT

I, Julio Corrales, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for warrant(s) to search the following electronic device(s):

> Blue Samsung Cellular Phone
> Case Number: SYS-24-03-0225
>
> ("**Target Device 1**")
>
> Black Realme Cellular Phone
> Case Number: SYS-24-03-0225
>
> ("**Target Device 2**")

Collectively the ("**Target Devices**"), as further described in Attachment A-1, and A-2, and to seize evidence of crimes, contraband, fruits of crime, or other items illegally possessed, and property designed for use, intended for use, or used in a crime, specifically, Conspiracy to Bring In Certain Aliens in violation of 18 U.S.C. § 371; Bringing In Aliens for Financial Gain in violation of 8 U.S.C. § 1324(a)(2)(B)(ii); and Unlawful Entry in violation of 8 U.S.C. § 1325, as further described in Attachment B.

2. The requested warrants relate to the investigation and prosecution of *United States v. Rolon* in 24CR684, which involves the owners of the **Target Devices**: Material Witnesses Zulemy Yohana RAQUEC-Mucia (MW1) and Yonathan IXAN-Marroquin (MW2). The investigation and prosecution of Defendant Rolon includes charges of Conspiracy to Bring In Certain Aliens in violation of 18 U.S.C. § 371; Bringing In Aliens for Financial Gain in violation of 8 U.S.C. § 1324(a)(2)(B)(ii); and Aiding and Abetting in violation of Title 18 U.S.C. § 2. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, 720 E. San Ysidro Blvd., San Ysidro, CA.

1

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

**TRAINING AND EXPERIENCE**

4. I have been employed by U.S. Customs and Border Protection since 2013 and am currently assigned to the San Ysidro Criminal Enforcement Unit. I graduated from the CBP Basic Academy at the Federal Law Enforcement Training Center in Glynco, Georgia. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for fifteen years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the illegal entry of, and inducement, transportation, bringing in for financial gain, harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a CBP Officer, I have participated in the investigation of a number of cases involving the illegal entry of aliens, including the smuggling and bringing in of aliens for financial gain from Mexico into the United States and

2

transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of aliens committing illegal entry, alien smugglers, and alien transporters, in particular those who attempt to smuggle and bring in aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for aliens committing illegal entry and alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or other illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits aliens committing illegal entry, alien smugglers, and transporters to easily carry out various tasks related to the smuggling activities, including, *e.g.*, guiding aliens to specific meeting locations, remotely monitoring the progress of the aliens while the aliens are in transit warning accomplices about law enforcement activity in the area and the status of operations at ports of entry and check-points, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8. Illegal entry and smuggling of aliens generate many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens are also typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for aliens making their smuggling arrangements to be in contact with co-conspirator alien smugglers weeks to months in advance of an event to coordinate the event. It is also common for co-conspirators to

continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the aliens and alien smugglers after an apprehension has occurred.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in illegal entry and alien smuggling investigations, I am aware that individuals who are smuggled or engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying transportation routes, and communications to and from coordinators and organizers.

9. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the illegal entry of aliens may yield evidence:

    a. tending to indicate efforts by undocumented aliens to illegally enter or remain in the United States and their efforts to be smuggled from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

    c. tending to identify co-conspirators, criminal associates, or others involved in undocumented aliens illegally entering or remaining in the United States, or transportation of smuggled aliens;

  d. tending to identify travel to or presence at locations involved in undocumented aliens illegally entering or remaining in the United States, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

  e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

  f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

10. On March 11, 2024, at approximately 5:26 A.M., Miguel ROLON (ROLON), a United States Citizen, applied for admission into the United States (U.S.) from Mexico via the San Ysidro, California Port of Entry vehicle primary lanes. ROLON was the driver of a blue Honda Civic bearing California license plates. Upon inspection before a United States Customs and Border Protection (CBP) Officer, ROLON presented his California Identification Card and two United States passport cards bearing the initials J.I.P and G.E.P.U. on behalf of the two passengers, later identified as Zulemy Yohana RAQUEC-Mucia (MW1) and Yonathan IXAN-Marroquin (MW2). ROLON stated that he was going to Los Angeles, California, with nothing to declare from Mexico. ROLON claimed the passengers were his friends and they were returning to the United States after visiting the dentist in Mexico. The CBP Officer queried the travelers' information and noticed inconsistencies in travel. The CBP Officer attempted to interview MW1 and MW2 but noticed ROLON whispering to MW2. The officer elected to refer the vehicle and all occupants to the vehicle secondary lot for further inspection.

11. In secondary, a CBP Officer conducted an inspection of the documents provided and noticed MW2 did not a match the photo in the U.S. passport card presented on his behalf. An inspection of MW1's and MW2's property revealed Mexican driver's

licenses with their picture and different names from that of the U.S. passport cards. All occupants were escorted to the security office for further processing.

### Interviews of Defendant and Material Witnesses

13. At approximately 11:14 A.M., during a video-recorded interview, ROLON was advised of his Miranda rights and agreed to make a statement. ROLON first stated MW1 and MW2 approached him at a taco stand at 3:00 A.M., and asked ROLON for a ride to the United States. ROLON recanted his story after inconsistencies were discovered. ROLON stated his friend and co-worker had asked him if he could pick up his two children from the dentist in Tijuana and take them to San Bernardino. ROLON stated that his friend had lent him his car to pick up his children. ROLON further stated that he had previously crossed the U.S./Mexico International border with his friend in a vehicle.

14. During video-recorded interviews, MW1 stated she is a citizen and national of Guatemala, by virtue of birth in Patzun Chimaltenajo, Guatemala and does not possess the documents to lawfully enter, reside or pass through the United States. MW1 made smuggling arrangements and arrived in Tijuana, Mexico by plan about a month prior to driving the United States. MW1 stated she was going to San Bernardino, California. MW1 stated that she was picked up from a house at approximately 3:00 A.M and that ROLON provided the U.S passport card. MW1 stated that ROLON was in possession of the U.S passport card when he showed up to pick them up and she only saw the document before she boarded the vehicle. Defendant told the material witnesses that their names were going to be "Gabriela" and "Joel." MW1 stated she made her smuggling arrangements for an undetermined dollar amount but paid 50,000 Quetzales (or $6,402 USD) as a partial payment to ROLON's co-conspirator as a partial payment, and the last time she saw ROLON's co-conspirator was the night before they drove to the United States.

15. During conversations with officers and two video-recorded interviews, MW2 stated he is a citizen and national of Guatemala, by virtue of birth in Patzun, Chimaltenajo, Guatemala and does not possess the documents to lawfully enter, reside or pass through the United States. MW2 stated he was paying was paid $150,000 Quetzales (Guatemalan

6

currency) to be smuggled into the United States. MW2 stated he was never in possession of the U.S. Passport card and Defendant told the material witnesses to raise their hand if they heard the names "Gabriela or Joel." MW met ROLON's co-conspirator the day prior to Rolon's arrest and, on the day of the arrest, ROLON's co-conspirator rode as the front seat passenger and exited just before they arrived at the San Ysidro, California, Port of Entry. Defendant told MW2 that his co-conspirator would later cross into the United to bring the MWs' personal belongings and meet them in Los Angeles later that day. MW2 stated ROLON presented the documents to the CBP Officers. MW2 stated that on their way to secondary inspection, ROLON told MW1 and MW2 to tell the CBP Officers that they did not know him, and he was only giving them a ride.

16. Zulemy Yohana RAQUEC-Mucia (M1) acknowledged **Target Device 1** as hers and Yonathan IXAN-Marroquin acknowledged **Target Device 2** as his. Both Material Witnesses provided consent to download the **Target Devices** through their counsel; however, Material Witness Counsel gave limited consent for 30 days and for communications only, to include but not limited to phone call logs and messages. Based on the facts of this case, the United States seeks to obtain a broader scope of time specifically for **Target Device 1** and a broader level of access in both **Target Devices** so it is not limited to communications only.

17. Based upon my experience and training, consultation with other law enforcement officers experienced in illegal entry and alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**. I believe the **Target Devices** were used to coordinate the Material Witnesses' smuggling arrangements, communicate with co-conspirators, and to document the Material Witnesses' planned entry into, and intended travel within the United States, and to communicate with others to facilitate the same.

18. Accordingly, I request permission to search **Target Device 1** for data beginning on **January 11, 2024** (60 days prior to the Defendant Rolon's arrest and the MWs' detention) up to and including **March 11, 2024** (date of Defendant Rolon's arrest and the MWs' detention), because MW1 stated she made smuggling arrangements about a month prior and had already been in Tijuana for about a month before traveling to the Mexico-United States border. Additionally, I request permission to search **Target Device 2** for data beginning on **February 11, 2024** (30 days prior to the Defendant Rolon's arrest and the MWs' detention) up to and including **March 11, 2024** (date of Defendant Rolon's arrest and the MWs' detention).

## METHODOLOGY

19. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones, tablets, and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and

8

record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

19. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

20. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

21. Law enforcement has not previously attempted to obtain the evidence sought by this warrant except through the Material Witness' limited consent explained in paragraph 16. As of this submission, the phones are pending download. Because of the stringent limitations provided by the Material Witnesses' consent that prevent access to additional relevant content such as photographs and contact information, law enforcement is seeking this warrant as the first attempt through the Court.

### CONCLUSION

22. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of Conspiracy to Bring In Certain Aliens in violation of 18 U.S.C. § 371; Bringing In Aliens for Financial Gain in violation of 8 U.S.C. § 1324(a)(2)(B)(ii); and Unlawful Entry in violation of 8 U.S.C. § 1325.

23. Because the **Target Devices** were seized at the time of RAQUEC-Mucia and IXAN-Marroquin's detention and have been securely stored since that time, there is

probable cause to believe that such evidence continues to exist on the **Target Devices**. As stated above, I believe that the appropriate date range for this search on **Target Device 1** is **January 11, 2024** (60 days prior to the Defendant Rolon's arrest and the MWs' detention) up to and including **March 11, 2024** (date of Defendant Rolon's arrest and the MWs' detention), because MW1 stated she made smuggling arrangements about a month prior and had already been in Tijuana for about a month before traveling to the Mexico-United States border. On **Target Device 2**, the appropriate date range is **February 11, 2024** (30 days prior to the Defendant Rolon's arrest and the MWs' detention) up to and including **March 11, 2024** (date of Defendant Rolon's arrest and the MWs' detention).

24. Accordingly, I request that the Court issue warrants authorizing law enforcement to search the item described in Attachment A-1, and A-2, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_J Corrales_
Julio Corrales, CBP Officer

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 10th day of April, 2024.

_D. Thomas Ferraro_
HON. D. Thomas Ferraro
United States Magistrate Judge

10

# ATTACHMENT A-2

PROPERTY TO BE SEARCHED

The following property is to be searched:

> Black Realme Cellular Phone
> Case Number: SYS-24-03-0225
> ("**Target Device 2**")

**Target Device 2** is currently in the custody of the Department of Homeland Security, Customs and Border Protection, 720 E. San Ysidro Blvd., San Ysidro, CA.

# **ATTACHMENT B**

ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachment A-1, and A-2, includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the **Target Device 1** only is a period of **January 11, 2024,** to and including **March 11, 2024,** and for **Target Device 2** is a period of **February 11, 2024**, to and including **March 11, 2024**:

a. tending to indicate efforts by undocumented aliens to illegally enter or remain in the United States and their efforts to be smuggled from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in undocumented aliens illegally entering or remaining in the United States, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in undocumented aliens illegally entering or remaining in the United States, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

  f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code Sections 1324(a)(2)(B)(ii) and 1325, and Title 18, United States Code, Section 371.